IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Norfolk Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | Crim No. 2:13-cr-00080-AWA-LRL-1 |
| | ) | |
| LUIS ALBERTO NAVARRO, | ) | |
| | ) | |
| Movant. | ) | |

## MOTION FOR A MODIFICATION OF SENTENCE PURSUANT TO 18 U.S.C. § 3582(C)(1) AND FIRST STEP ACT OF 2018

COMES Movant, LUIS ALBERTO NAVARRO ("Navarro"), appearing *pro se,* and in support of this motion would show as follows:

## I. STATEMENT OF JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an

1

exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. STATEMENT OF THE CASE

### A.   Procedural Background

On June 5, 2013, a grand jury in the United States District Court for the Eastern District of Virginia, Norfolk Division returned a four (4) count Indictment charging Navarro and two other co-defendants. See Docs. 1, 3.[1] Count 1 charged Navarro with Conspiracy to Manufacture, Distribute, and Possess with Intent to Manufacture and Distribute 5 Kilograms or More of A Mixture and Substance Containing A Detectable Amount of Cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), and 846. *Id.* Count 2 charged Navarro with Possession with Intent to Distribute 2 Kilograms or More of A Mixture and Substance Containing A Detectable Amount of Cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. *Id.* Counts 3 and 4 charged

---

[1]   "Doc." refers to the Docket Report in the United States District Court for the Eastern District of Virginia, Norfolk Division in Criminal No. 2:13-cr-00080-AWA-LRL-1, which is immediately followed by the Docket Entry Number.

Navarro with Possession with Intent to Distribute 12 Kilograms or More of A Mixture and Substance Containing A Detectable Amount of Cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. *Id.* The Indictment also contained a Criminal Forfeiture, pursuant to 18 U.S.C. §§ 924(d) and 981(a)(1)(C), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c). *Id.*

On September 10, 2013, a Plea Agreement Hearing was held and Navarro pleaded guilty as to Count 1 of the Indictment, pursuant to a Written Plea Agreement. See Docs. 51, 52.

On December 13, 2013, Navarro was sentenced to a term of 360 months' imprisonment, 5 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100. See Docs. 67, 70.

On June 16, 2015, Navarro filed a Motion to Reduce Sentence - USSC Amendment, which was denied on November 25, 2015. See Docs. 88, 89, 105.

On May 12, 2020, Navarro filed a Motion for Compassionate Release, which was dismissed in part and denied in part, on June 23, 2020. See Docs. 147,154.

On September 17, 2020, Navarro filed a Motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), which was dismissed as untimely on March 17, 2023. See Docs. 155, 156, 201.

## B.   Statement of the Facts

### 1.   Offense Conduct

The government and Navarro, through the advise of his counsel, agreed to the

following statement of facts:

In early 2012, the Drug Enforcement Administration (DEA) and Federal Bureau of Investigation (FBI) began conducting an investigation into a cocaine distribution ring that extended from the Hampton Roads area to Arizona, New York, Pennsylvania, Indiana, and other locations throughout the United States.

Information gathered pursuant to this investigation revealed that the defendant, Luis Alberto Navarro, recruited, supervised, managed and organized others to transport and distribute cocaine and proceeds from the distribution of cocaine from locations in Arizona and elsewhere throughout the United States. Navarro also traveled extensively throughout the United States to further the efforts of this nationwide conspiracy. Frequently, Navarro acted at the request and directions of his supervisors within the cocaine distribution ring.

Beginning in approximately 2006, Navarro began his involvement in this cocaine distribution ring. Navarro was a leader and organizer within the extensive conspiracy involving more than five participants. While Navarro primarily operated out of the Tucson, Arizona area, he also maintained a nationwide network of distribution points, including a stash house in Indianapolis, Indiana jointly maintained with co-conspirator John Nathan Fitzgerald.

After obtaining cocaine from one or more unknown sources of supply in Mexico, Navarro, acting along with his brother, Carlos Navarro Durazo ("Durazo"), would secrete the cocaine both inside the lining of coolers and inert, hollowed-out fire extinguishers in order to avoid detection during transportation in furtherance of the conspiracy. Similarly, Navarro and Durazo would secrete bundles of currency -

4

proceeds from the distribution of cocaine - inside the lining of coolers for transportation to their hub in Arizona.

To further the conspiracy, Navarro traveled by airplane to Norfolk, Virginia, in the Eastern District of Virginia, on multiple occasions to meet with distributors, couriers, and other members of the extensive organization, including Omar A. Martinez - a high-level distributor who operated out of the Tidewater area and other locations.

In or about May 2011, Navarro and Durazo recruited co-conspirator Mario A. Ruiz - a commercial tractor-trailer driver - to transport cocaine to multiple locations throughout the United States in furtherance of the conspiracy. Navarro and Durazo supplied Ruiz with coolers and fire extinguishers to transport along with Ruiz's legitimate cargo loads, and would direct Ruiz to take the cocaine to various locations throughout the United States, including Indianapolis, Indiana and Carlisle, Pennsylvania. Navarro paid Ruiz several thousand dollars per trip for his efforts.

On or about May 2, 2012, DEA and FBI special agents arrested co-conspirator Martinez at a residence in Hampton, Virginia, in possession of, among other things, approximately 2.5 kilograms of cocaine, $117,000 in United States currency, and a firearm. Investigators learned that Martinez retrieved this cocaine from Navarro's and Fitzgerald's joint stash house in Indianapolis to Hampton on or about April 28, 2012, and transported it to the Eastern District of Virginia for further distribution.

On or about June 28, 2012, DEA agents in Rolla, Missouri, arrested Ruiz and another co-conspirator during the attempted delivery of nineteen (19) kilograms of cocaine destined for Navarro and Fitzgerald. This cocaine transported by Ruiz and his co-conspirator had been concealed inside the walls of a cooler, as well as inside of three inert, hollowed-out fire extinguishers.

On or about November 7, 2012, officers from the Tucson Police Department responded to a concerned-citizen call about potential drug

activity at Durazo's residence in Tucson, Arizona. Based upon information gathered from a search of Durazo's home, shortly thereafter, state search warrants were executed on two Tucson residences connected with Navarro - one on Sunkist Drive and one on Cherry Avenue. From these two residences officers recovered, among other things, a digital scale, seven cellular telephones, drug packaging materials, drug ledgers, assorted surveillance equipment, and an AK-47 firearm, possessed and used for protection of the conspiracy.

On or about June 4, 2013, Navarro and Fitzgerald met with undercover officers from the Inland Crackdown Allied Task Force (ICATF) in Riverside, California in order to arrange the purchase of a large quantity of cocaine. ICATF audio- and video-taped the transaction. Through a nationwide, joint coordination effort with ICATF, special agents from the Norfolk and Raleigh offices of the DEA and FBI arrested Navarro and Fitzgerald approximately one week later, in Raleigh, North Carolina, during the attempted purchase of fifteen (15) kilograms of cocaine with $300,000 in United States currency concealed in the lining of two suitcases. Navarro made incriminating statements at the time of his arrest after being properly advised of his *Miranda* rights.

See Doc. 53 at 1-4.

### 2.    Plea Proceeding

On September 10, 2013, a Plea Agreement Hearing commenced before District Judge Arenda L. Wright Allen. See Doc. 51. Navarro entered a guilty plea as to Count 1 of the Indictment, pursuant to a Written Plea Agreement. See Doc. 52. In exchange of his guilty plea, the government agreed to: (1) not further criminally prosecute Navarro; and (2) dismiss the remaining counts in the Indictment. *Id.*

### 3.    Sentencing Proceeding

On December 13, 2013, a Sentencing Hearing was held before District Judge Arenda L. Wright Allen. See Doc. 67. The District Court sentenced Navarro to 360 months' imprisonment. See Doc. 70. It is followed by 5 years' Supervised Release. *Id.* The Court also ordered a payment of a Mandatory Special Assessment Fee of $100.00. *Id.* No direct appeal was filed in this case.

### 4.    Postconviction Proceeding

On September 17, 2020, Navarro filed a § 2255 Motion. See Docs. 155, 156. On his Motion, Navarro argued that he was denied his Sixth Amendment right to effective assistance of counsel during the plea negotiation and sentencing phase for the following reasons: (1) his counsel did not use a Spanish language interpreter to communicate with him, and Navarro therefore did not knowingly agreed to the terms of his plea agreement; and (2) during the plea-bargaining phase, Navarro's counsel led him to believe that he would be guaranteed a reduced sentence of 180 months if he pleaded guilty and cooperated with the Government. *Id.* Navarro asserted that this language barrier and his attorney's alleged "misadvice" led him to accept a guilty plea resulting in a sentence of 360 months that he would not have otherwise agreed to. *Id.* Navarro further contended that the facts supporting his constitutional claim have only recently come to light and his collateral attack on his sentence pursuant to 28 U.S.C.

§ 2255(f)(4) was therefore timely. *Id.*

On April 15, 2021, the Court found that Navarro's § 2255 Motion was untimely but ordered Navarro to submit additional briefing on the issue of whether the statute of limitations should be equitably tolled. *Id.* On April 29, 2021, Navarro filed a supplemental memorandum in support of his § 2255 Motion. *Id.* The § 2255 Motion has been ripe for adjudication. See *Raines v. United States*, 423 F.2d 526, 528 (4th Cir. 1970) (permitting district court to summarily deny § 2255 motion if petitioner is not entitled to relief when viewed against the record). *Id.*

Because Navarro filed his § 2255 Motion more than a year after the judgment became final, and no tolling provisions apply, his Motion was DISMISSED AS UNTIMELY without a hearing on March 17, 2023. See Doc. 201. In addition, because Navarro has failed to demonstrate "a substantial showing of the denial of a constitutional right," the Court shall not issue a certificate of appealability pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure. Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). *Id.*

## III. <u>DISCUSSION</u>

As a preliminary matter, Navarro respectfully requests that this Court be mindful that courts have a duty to construe *pro se* motions liberally. See *Clark v. Cartledge,* 829 F.3d 303 (4th Cir. 2016) (*Pro se* pleadings are to be held to less

stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (same).

## A. Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Navarro's sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1. Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. §3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion

in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id.* at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id.* Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

10

### 2. Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could, however, be considered with other reasons to justify a reduction.

Pursuant to section 994(p) of title 28, United States Code, the United States Sentencing Commission hereby submits to the Congress the following amendments to the Guidelines Manual and the reasons therefor. As authorized by such section, the Commission specifies an effective date of November 1, 2023, for these amendments:

(b) *Extraordinary and Compelling Reasons.–* Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

(1) *Medical Circumstance of the Defendant.–*

(A) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.

11

(B)   The defendant is—

     (i)    suffering from a serious physical or medical condition,

     (ii)   suffering from a serious functional or cognitive impairment, or

     (iii)  experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C)   The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

(D)   The defendant presents the following circumstances—

     (i)    the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

     (ii)   due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

     (iii)  such risk cannot be adequately mitigated in a timely manner.

12

(2) *Age of the Defendant.*— The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(3) *Family Circumstances of the Defendant.*—

(A) The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

(B) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(C) The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

(D) The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

(4) *Victim of Abuse.*— The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

13

(A)  sexual abuse involving a 'sexual act,' as defined in 18 U.S.C. § 2246(2) (including the conduct described in 18 U.S.C. § 2246(2)(D) regardless of the age of the victim); or

(B)  physical abuse resulting in 'serious bodily injury,' as defined in the Commentary to §1B1.1 (Application Instructions); that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant. For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

(5)  *Other Reasons.*— The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6)  *Unusually Long Sentence.*— If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

14

This amendment responds to, among other things, the First Step Act of 2018 ("First Step Act"), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239, which amended 18 U.S.C. § 3582(c)(1)(A) to authorize courts to grant a motion for a sentence reduction upon a defendant's own motion. Previously, a court was authorized to do so only upon the motion of the Director of the Bureau of Prisons ("BOP"). Congress amended the law for the express purpose, set forth on the face of the enactment, of "increasing the use" of sentence reduction motions under section 3582(c)(1)(A). First Step Act § 603(b).

### 3.   The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id.* at § 603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate motion if he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency

15

of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as ... improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

### 4.   Navarro Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

In this case, Navarro filed a request for compassionate release to the Warden at FCI Englewood. However, he did not receive any response yet. Because 30 days have lapsed from the receipt of the request and the BOP failed to file a motion on

16

Navarro's behalf, exhaustion of administrative remedies is not an issue in this case.

See 18 U.S.C. § 3582(c)(1)(A).

## B.  The Changes in Relevant Law, along with Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct, Are Extraordinary and Compelling Circumstances That Warrant Release.

Section 3582(c) states that a district court cannot modify a term of imprisonment once it has been imposed except that, in any case:

> The court, upon motion of the Director of the Bureau of Prisons, or the defendant, pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

> (i)  extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A).

In this case, there are at least five extraordinary and compelling reasons warranting such a reduction, discussed as follows:

### 1.  Victim of Abuse – Sentence Reduction Eligibility

On August 27, 2024, Graciela Ibarra ("Ibarra"), the significant other of Navarro, filed a formal complaint regarding the sexual, physical, and verbal abuse

17

Navarro endured during a Bureau of Prisons (BOP) search at FCI Lompoc I on August 25, 2024. See Exhibit 1. Although the complaint was submitted via the BOP's official web portal, Ibarra later learned it had been routed directly to the prison's internal affairs or warden—precisely the internal channels she sought to avoid, citing concerns for Navarro's safety and the staff's apparent indifference to misconduct allegations.

According to Ibarra's complaint, Navarro was initially slapped on the hand by Lieutenant Vermullen after merely asking whether Vermullen was the new lieutenant. The encounter escalated when Lt. Vermullen shouted profanities and verbally abused Navarro. After the search, Navarro was isolated and taken by Lt. Vermullen, SIS Lt. Harms, and Correctional Officer Peinado to a small cell-like room under the pretense of a "routine body check." There, he was forced to undress completely. The officers allegedly ordered him to masturbate, kneel on a bench, and spread his buttocks while they examined his anus—conduct that far exceeds the lawful scope of a visual body cavity inspection, and which constitutes sexual abuse under 18 U.S.C. § 2246(2)(D). This type of conduct also violates the Eighth Amendment prohibition against cruel and unusual punishment. See *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

When Navarro attempted to report the incident, his complaint was rerouted to one of the alleged abusers, Lt. Vermullen, by Correctional Officer Davis. Navarro

18

was then threatened with physical harm and social retribution—namely, being labeled a "rat" to other inmates, which could subject him to beatings or expulsion from the general compound. These threats amount to direct retaliation by correctional officers and demonstrate the futility and danger of attempting to exhaust administrative remedies. The Fourth Circuit has acknowledged that abuse, particularly sexual abuse and coercion in custody, may constitute an "extraordinary and compelling" basis for sentence modification. See *United States v. Shorter*, 12 F.4th 366, 371 (4th Cir. 2021); *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) (holding that district courts may consider the "full slate" of reasons for release, including abuse, regardless of U.S.S.G. § 1B1.13's narrow language).

In light of BOP inaction, Ibarra wrote directly to the Hon. Judge Yvonne Gonzalez on September 3, 2024, naming several BOP staff members accused of abuse or misconduct, including: SIS Lieutenant Harms, Lieutenants Vermullen, Pena, Pineda, and Galindo (Male); Unit Manager Camacho; Correctional Officers Peinado, Dani Offe, and Quian; and Counselors Razo, Mendoza, and Rana. See Exhibit 1. Navarro later filed an administrative appeal challenging the BOP Regional Director's response. On November 16, 2024, additional documentation of the incident was compiled by SIA Barela, Dr. Clegg (BOP Psychologist), and Mr. Fabie (BOP Health Services), but no corrective action followed.

19

The severity of the abuse—particularly the coerced sexual conduct and retaliatory threats—and the systemic failure of the BOP to take appropriate investigative or disciplinary action render Navarro's continued incarceration unjust. Moreover, Navarro contends that this abuse and the coercive environment it created undermined his ability to knowingly and voluntarily enter into the Plea Agreement, thereby tainting the integrity of the underlying conviction and violating due process. The abuse, and the fear instilled by threats of further harm, constituted a constructive breach of the BOP's legal obligation to ensure safe and humane custody, eroding the fairness of his plea and post-conviction experience.

Navarro's subjection to abuse did not end with the August 2024 incident. On January 9, 2025, he was again targeted during a cell search conducted in A-Dorm, where an Incident Report alleged that he was found in possession of contraband: a fake tablet hidden in a dustpan, within which a blue Motorola cellular phone was discovered. The report further claimed that the device contained several photos, one of which bore Navarro's name—allegedly concealed beneath black permanent marker.

However, this report raises serious credibility and procedural concerns that suggest it was part of an ongoing campaign of retaliation. Navarro, according to Bureau of Prisons records, was housed in K-Dorm at the time of the alleged

20

violation—an entirely different housing unit separated by at least two secure gates. See Exhibit 2. The implication that Navarro somehow planted or possessed contraband in a dorm he did not reside in, with no recorded movement or authorization to access A-Dorm, casts doubt on the legitimacy of the search and resulting disciplinary action.

Ibarra once again intervened and sent email communications to BOP staff disputing the factual and procedural basis of the Incident Report and pointing out the implausibility of Navarro's alleged access to the contraband's location. Her correspondence highlighted flaws in the investigative process and the absence of meaningful review or impartial oversight.

Despite the lack of credible evidence linking Navarro to the contraband and the serious procedural questions raised, he was subjected to additional punitive measures, including loss of privileges and internal disciplinary sanctions. These measures were imposed without adequate due process protections, further illustrating the pattern of abuse and retaliatory treatment he faced for attempting to report earlier misconduct.

Such retaliatory punishment—particularly in the absence of clear evidence and following complaints of official misconduct—violates core principles of constitutional due process and protections against cruel and unusual punishment. See *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (abuse by prison officials need not result

in serious injury to violate the Eighth Amendment); see also *Harris v. Ostrander*, 2022 WL 2446320, at *3 (4th Cir. July 5, 2022) (unpublished) (acknowledging a claim for retaliation where an inmate faced fabricated disciplinary action after filing complaints).

Moreover, the cumulative effect of these incidents—first the documented sexual abuse in August 2024, then a questionable disciplinary report months later tied to a location Navarro had no access to—further supports Navarro's request for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A). Courts may consider not only isolated incidents of abuse but the overall environment of mistreatment and retaliatory conduct as part of an "extraordinary and compelling" basis for relief. See *United States v. Beck*, 425 F. Supp. 3d 573, 586–87 (M.D.N.C. 2019) (granting compassionate release where BOP failed to protect inmate from harm and engaged in retaliatory conduct).

Here, Navarro's situation reflects a systemic failure to protect his constitutional rights and a continued pattern of retaliatory behavior by prison officials, rendering his continued incarceration both unsafe and unjust. As such, this incident—along with prior misconduct—further strengthens the argument for compassionate release or sentence reduction.

      2.    Requests Based on Non-medical Circumstances – Mother's Incapacitation

n this case, Suleme Noeme Lamas ("Lamas"), the mother of Navarro's 13-year-old son, Ulises Cristiano Navarro-Flores ("Ulises"), has formally granted full custody of their child to Navarro. See Exhibit 3. Lamas' decision is based on her ongoing efforts to rehabilitate from substance abuse involving drugs and alcohol, coupled with her employment obligations, which severely limit her capacity to provide adequate care for Ulises. Moreover, Lamas reports ongoing domestic instability, including frequent conflicts with her current husband, and expresses concern over whether her spouse would treat Ulises appropriately. She has, therefore, voluntarily relinquished custody to Navarro in the best interest of their child, who requires increased support for his educational and behavioral needs.

Ulises is currently undergoing therapy for social and learning difficulties and is prescribed behavioral medication. Lamas believes that Navarro's absence has exacerbated their son's emotional and developmental challenges, and that reuniting them would serve Ulises' best interests. The Fourth Circuit has recognized that non-medical family circumstances—such as the incapacitation of a child's caregiver—may, in appropriate cases, justify compassionate release. See *United States v. Wooten*, 688 F. App'x 140, 144 (4th Cir. 2017) (acknowledging the BOP's recognition of family circumstances involving the incapacitation of a caregiver as potentially "extraordinary and compelling"); see also *United States v. Trotman*, No.

1:19-CR-00245, 2020 WL 7398714, at *5 (M.D.N.C. Dec. 17, 2020) (granting compassionate release where a parent was the only available caregiver for a child with special needs).

In light of these facts, Navarro's request is not grounded in a generalized hardship but in specific, documented circumstances of parental necessity and the best interests of a vulnerable minor child. His presence is essential to the physical, emotional, and developmental stability of Ulises—conditions that courts have found may justify a sentence reduction under 18 U.S.C. § 3582(c)(1)(A).

### 3. Long and Unusual Sentence

Navarro has served over 12 years of his sentence—an exceptionally long period under circumstances that warrant careful reevaluation in light of evolving sentencing standards and the unique factors present in his case. A sentence of this length, particularly when imposed during an era of harsher sentencing norms or in the absence of individualized consideration for mitigating factors, may qualify as "extraordinary and compelling" under 18 U.S.C. § 3582(c)(1)(A).

While the length of a sentence alone is not typically sufficient to justify compassionate release, the Fourth Circuit has acknowledged that it may be considered in conjunction with other circumstances. In *United States v. McCoy*, 981 F.3d 271, 285–86 (4th Cir. 2020), the court held that a combination of excessive sentence length

and significant rehabilitation can amount to "extraordinary and compelling" reasons for a reduction. In *McCoy*, the court granted relief to defendants who had served over a decade in prison for offenses that, under current law and sentencing policy, would have carried significantly shorter terms. The court emphasized that district courts may consider "the severity of the sentence in light of the current sentencing landscape" as part of a compassionate release analysis.

Similarly, in *United States v. Decator*, 452 F. Supp. 3d 320 (D. Md. 2020), the court found extraordinary and compelling reasons where a defendant had already served 16 years of a mandatory sentence that would no longer be imposed today, especially where the defendant demonstrated rehabilitation and maintained strong family support. Courts within the Fourth Circuit have echoed this reasoning, allowing sentence reductions where continued incarceration would produce a grossly disproportionate or unnecessary result, especially for defendants who pose no danger to the community.

Navarro's 12 years of incarceration—particularly when considered alongside his family responsibilities, rehabilitation, and the nonviolent nature of his offense—place his case within the zone of cases where courts have found relief appropriate. Continuing his imprisonment may serve little penological purpose, especially given the significant time already served, the support system waiting for

him upon release, and the pressing needs of his minor son, Ulises.

Thus, under the standard articulated in *McCoy* and its progeny, Navarro's long sentence—when viewed in combination with his post-sentencing conduct and changed personal circumstances—qualifies as an "extraordinary and compelling" reason to grant compassionate release.

### 4. Post-Sentencing Reclassification of Prior Conviction

On March 26, 2025, the Pima County Attorney, Laura Conover, filed no objection to Navarro's Motion to Designate Offense from Felony to Misdemeanor in Case No. CR20011881. See Exhibit 4. The motion was subsequently granted, resulting in the reclassification of Navarro's prior offense from a felony to a misdemeanor under Arizona law. This post-sentencing development carries substantial implications for Navarro's criminal history category and, consequently, the calculation of his sentencing guideline range.

At the time of Navarro's original sentencing, the now-reclassified offense was treated as a felony and factored into the computation of his criminal history score and category level—potentially resulting in a higher sentencing range under the U.S. Sentencing Guidelines. Given that the classification of this offense has since been legally downgraded, continued reliance on the outdated felony designation improperly inflates Navarro's criminal history and overstates his risk profile.

26

Although the Sentencing Guidelines are advisory, courts have recognized that post-sentencing developments may constitute "extraordinary and compelling" reasons for relief under 18 U.S.C. § 3582(c)(1)(A). In *United States v. Banks*, No. 1:08-cr-00091, 2022 WL 1664474, at *4 (M.D.N.C. May 25, 2022), the court acknowledged that "developments in the legal status of a prior conviction" can factor into the compassionate release analysis. Moreover, in *United States v. Johnson*, No. 3:99-CR-264, 2021 WL 2379474 (D. Conn. June 10, 2021), the court granted relief where a prior conviction no longer triggered a sentencing enhancement due to changes in state law, stating that such changes undermined the basis for the original guideline range.

Although the Fourth Circuit has not directly ruled on whether reclassification of a prior offense constitutes a stand-alone ground for compassionate release, district courts within the circuit have routinely held that the cumulative impact of such post-sentencing legal and factual developments—when coupled with factors such as rehabilitation and family hardship—can support a finding of "extraordinary and compelling reasons." See *McCoy*, 981 F.3d at 284.

Therefore, the reclassification of Navarro's prior conviction from felony to misdemeanor materially affects the integrity of his original sentencing calculation. In fairness and consistent with evolving jurisprudence, this change should be reflected

27

in a recalculation of his sentence or, at minimum, considered as a factor justifying compassionate release under § 3582(c)(1)(A).

5. <u>Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Granted Compassionate Release</u>

With respect to the need to avoid unwarranted sentencing disparities, Navarro urges the Court to consider the *Redd* cases:

i. *United States v. Clark*, Case No. 11-CR-30-2-JPS (E.D. Wis. Jul. 23, 2020)
- Quoting that in *Redd*, the Court evaluated whether extraordinary and compelling reasons existed to reduce the sentence by considering (1) the sentence the defendant originally received compared to the one he would receive today; (2) the disparity between those sentences; and (3) the reason for that disparity. *Redd*, 2020 WL 1248493, at *5. There, the court determined that the disparity was "primarily the result of Congress' conclusion that sentences like [defendant's] are unfair and unnecessary." *Id*. at *6.

ii. *United States v. Brooks*, Case No. 07-cr-20047-JES-DGB (C.D. Ill. May. 15, 2020)
- Quoting that in *Redd*, the district court held "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in USSG § 1B1.13 cmt. n.1(A)-(C) and that the reasons it has determined in this case constitute extraordinary and compelling reasons

28

warranting a sentence reduction satisfy any requirement for consistency with any applicable policy statement."

Navarro is now, in effect, to be re-sentenced today, after the passage of the First Step Act; and the need to avoid unwarranted sentencing disparities is to be assessed at the time of his sentencing today relative to those comparable offenders who have been sentenced following the passage of the First Step Act. Nor does the First Step Act's lack of retroactivity justify withholding sentencing relief given the overall purpose of the First Step Act amendments, which expressly allowed for the possibility for a sentence reduction based on an individualized assessment of the § 3553(a) factors and other criteria.

See e.g., *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) (recognizing that "a district court may consider disparities among co-defendants in determining a sentence"); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) ("Although § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so."); *United States v. Gomez*, 215 F. App'x 200, 202 (4th Cir. 2007) (implying that consideration of co-defendant disparities is allowed, but concluding that Gomez was not similarly situated to the co-defendant); *United States v. Bennett*, 664 F.3d 997, 1015 (5th Cir. 2011) ("[A]voiding unwarranted sentencing disparities among co-defendants is a

29

valid sentencing consideration."), cert. denied, 11-9109, 2012 WL 733887 (Apr. 2, 2012); *United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) ("A district judge, however, may exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence."); *United States v. Pulley*, 601 F.3d 660, 668 (7th Cir. 2010) ("Pulley properly contends that § 3553(a)(6) does not allow unwarranted sentencing disparities between co-defendants." (citing *Statham*, 581 F.3d at 556; *Bartlett*, 567 F.3d at 908–09)); *United States v. Lazenby*, 439 F.3d 928, 933 (8th Cir. 2006) (invalidating a sentence that resulted in unwarranted disparities between the sentences of the defendant and less culpable members of related conspiracies); *United States v. Saeteurn*, 504 F.3d 1175, 1181–83 (9th Cir. 2007) (upholding as a legitimate generalized § 3553(a) consideration the district court's decision to compare defendant with his co-defendants and sentence him in accordance with his role); *United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("[A] district court may also properly account for unwarranted disparities between codefendants who are similarly situated, and...the district court may compare defendants when deciding a sentence."); *United States v. Zavala*, 300 F. App'x 792, 795 (11th Cir. 2008) ("It is not erroneous for the district court to have considered the 'unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' when the statute specifically mandates such consideration."); *United States v. Mejia*, 597

30

F.3d 1329, 1344 (D.C. Cir. 2010) (considering and rejecting an argument that a disparity between co-defendants' sentences was unwarranted), cert. denied, 131 S. Ct. 586 (2010).

Under 18 U.S.C. § 3582(c)(2), to modify Navarro's sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Accordingly, Navarro prays that this motion be granted.

## IV. <u>CONCLUSION</u>

For the foregoing reason, Navarro prays this Court would consider his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018 in accordance with U.S.S.G. Amendment 814, based upon the "extraordinary and compelling reasons" and reduce his sentence.

Respectfully submitted,

31

Dated: January _30_, 2026

LUIS ALBERTO NAVARRO
REG. NO. 57509-056
FCI ENGLEWOOD
FEDERAL CORR. INSTITUTION
9595 WEST QUINCY AVENUE
LITTLETON, CO 80123
Appearing *Pro Se*

## CERTIFICATE OF SERVICE

I hereby certify that on January _30_,2026,  a true and correct copy of the above and foregoing Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018 was sent via U. S. Mail, postage prepaid to: Amanda L. Cheney, Assistant U.S. Attorney at DOJ - United States Attorney's Office, 101 W. Main Street, Ste. 8000, Norfolk, VA 23510.

LUIS ALBERTO NAVARRO